Filed 2/25/14  P. v. Sanchez CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>LUIZ RICK SANCHEZ,<br><br>　　　　Defendant and Appellant. | A135424<br><br>(Alameda County<br>Super. Ct. No. CH50321) |

## I.  INTRODUCTION

Luis Rick Sanchez was convicted by a jury of the second degree murder of his mother's husband, Humberto Diaz.  (Pen. Code, § 187, subd. (a).)[1]  The jury also found true an allegation that Sanchez personally and intentionally discharged a firearm causing great bodily injury.  (§§ 12022.7, subd. (a), 12022.53, subd. (d).)  The trial court sentenced Sanchez to a state prison term of 40 years to life, and did not award any credit for time served.

Sanchez contends the judgment must be reversed because (1) there is insufficient evidence to support the second degree murder conviction; (2) the trial court refused to give a special jury instruction regarding his heat of passion defense; and (3) the prosecutor committed misconduct.  Sanchez also contends the trial court erroneously denied him credits for time served in county jail prior to sentencing.  Aside from the

---

[1]  Unless otherwise indicated, statutory references are to the Penal Code.

1

sentencing error, which the People concede, we reject Sanchez's contentions and affirm the judgment.

## II. STATEMENT OF FACTS

### A.  *The Prosecution Case*

#### 1.  *Background*

In September 2010, Sanchez was 55-years-old, had custody of his two young grandsons, and lived with his mother, Juanita Diaz, and Juanita's husband, Humberto, in the Diaz's Union City home.[2]  Humberto earned money for the family working as a hod carrier, while Sanchez stayed at home and took care of Juanita, who had a broken pelvis and other serious medical problems.  Humberto, who had been married to Juanita for more than 30 years, was only a few years older than Sanchez, and the two men did not get along well.  According to Juanita, they argued all the time, Humberto constantly complained about Sanchez, and he repeatedly tried to get him to move out of the house.[3]

On September 11 or 12, Sanchez and Humberto had a loud argument in front of Juanita.  Arturo Raygoza, a family friend who was working on a construction project at the Diaz house, could hear people arguing from outside.  During the argument, Sanchez chastised Humberto for not treating Juanita well.  He complained that Humberto was "messing around" while Sanchez was doing everything he could to care for Juanita.  Sanchez also accused Humberto of trying to have sex with his daughter Anna, who was the mother of the two young boys who lived with Sanchez at the Diaz home.  During the argument, Humberto told Sanchez to move out, as he often did.  And, at one point, both men threatened to kill each other.  The next day, Humberto told Juanita that he planned to kick Sanchez out of the house and to change the locks.

---

[2]  For clarity, we use first names when referring to Juanita, Humberto and Sanchez's daughter, Anna Sanchez.

[3]  Sanchez testified that Humberto was three years older than him and 12 years younger than Juanita.  Juanita died before trial, but excerpts from her March 23, 2011, preliminary hearing testimony were read to the jury.

2

**2.** *September 14, 2010*

September 14 started as a normal day. Humberto got up early and went to work and Sanchez cared for Juanita who spent the day in bed as she normally did. Raygoza was at the house for most of the day, working on the construction project, a small addition to the back of the house. At some point during that day, Juanita told Sanchez that Humberto had told her that he was going to change the locks.

Shortly after 4:00 p.m., Humberto arrived home from work. As was his habit, he went around the outside of the house to look at the construction project before going inside to check on Juanita. From an outside entrance, Humberto went into the new room, which was connected to the main house through another door leading into the kitchen. Humberto seemed happy with the progress of the project as he and Raygoza talked about plans for installing a new water heater. They knelt down on the floor facing each other, with the diagram in between them, and discussed the parts they would need to buy.

Humberto was facing the kitchen door and Raygoza was kneeling opposite him when Sanchez entered the room from the kitchen. Raygoza heard Sanchez say "I told you not to fuck with me," and then he heard a "pop." Raygoza looked up and saw a dark mark on Humberto's white t-shirt on the left side of his chest. A second or two later, there was a second "pop." Humberto looked down at his chest. He seemed scared and like he might be in shock as he got to his feet and ran toward the door leading outside. Raygoza heard a third shot before Humberto was out the door. Raygoza looked at Sanchez who was pointing what appeared to be a semi-automatic gun directly at Humberto. After firing the third shot, Sanchez "just turned around and walked back into the kitchen" through the interior door.

Raygoza had trouble believing these events were real; he thought for a moment that perhaps Sanchez was just "messing" around with a pop gun. But, when he went outside, he found Humberto lying on the cement next to Raygoza's truck, trying to breathe. Raygoza spent a few minutes going back and forth between his truck and the back of the house looking for his phone to call 911. He heard voices inside the house and he heard Sanchez say " 'I told you I was gonna do something to him.' "

Inside the house, Juanita had heard a few loud "pops," but she did not think much about it until Sanchez came into her room and said "you are husbandless," and told her that Humberto was dead. Sanchez did not appear agitated or excited but spoke in a monotone voice. Juanita suggested that Sanchez did not mean what he was saying. But when Sanchez said it was true, she made herself get up and used her walker to go to the front door where she saw Humberto lying motionless on the ground. Juanita could not go down the front steps, but Sanchez did go outside. He asked Raygoza if he had called 911 and Raygoza confirmed that he had. Then Sanchez walked toward Humberto. As he stood over the body, Sanchez appeared angry and agitated and he began yelling and screaming, telling Humberto "fuck you."

### 3. *The Investigation*

When police arrived, they drew their weapons and ordered Sanchez and Raygoza to raise their hands in the air. Sanchez complied and, as he walked out from behind the truck, he said "I'm the shooter." The officer placed handcuffs on Sanchez and Raygoza. Then, as Sanchez sat on the curb next to the police car, he told Raygoza "Sorry. You shouldn't have been here."

The police videotaped Sanchez as they questioned him for several minutes about the location of the gun. Sanchez denied any remorse, saying "The one person that I wanted to hurt is hurt and that's all that matters." He also attempted to justify his decision to shoot Humberto, telling the officers that the man was married to his mother and had tried to rape his daughter, that he treated Sanchez's grandchildren "like shit," and that he was going to throw Sanchez and the boys out into the street. Ultimately, Sanchez told the police where he had hidden the gun and gave them permission to search the house.

During the ride from the crime scene to the police station, Sanchez did not appear agitated; he was calm and quiet for the entire ride. At the station, police found a .25-caliber live bullet in the pocket of Sanchez's pants. At the house, they recovered a .25 caliber semi-automatic handgun in a coffee can on top of the refrigerator in the kitchen. There were no live rounds left in the magazine or chamber of the gun.

4

A firearm expert from the county Sherriff's office tested the gun recovered from the Diaz home. The loading mechanism did not function properly; two out of three times, the bullet was ejected before it was chambered. The recoil spring was worn, and the trigger did not pull easily.

An autopsy was performed by Dr. Thomas Rogers, who determined that Humberto died from multiple gunshot wounds. Rogers documented three different entrance wounds, but he only recovered two bullets from inside Humberto's body. At trial, Rogers acknowledged that a bullet which entered through Humberto's arm could have exited at the inside of the arm and re-entered the body at his torso. Thus, the autopsy findings were consistent with either two or three shots having been fired.

**B.** *The Defense Case*

**1.** *Anna Sanchez*

Sanchez's daughter Anna testified that she was 13 when she went to live with her father at the Diaz home. Sanchez had always been the father figure for Anna's own children, and he moved with them to Ohio for several years before they all returned to Union City in 2005. The family left Ohio after an ex-boyfriend assaulted Anna and they moved back into the Diaz home because they had no place else to live.

Anna admitted that, from 2006 until 2009, she had a serious methamphetamine drug addiction. As a result of this habit, she was frequently jailed and her behavior was not acceptable to Juanita, who kicked her out of the Diaz house in 2006. Anna left her children with Sanchez and signed her welfare benefits over to him. Although Juanita never forgave her or let her back into the house, Anna saw Sanchez often and was very aware of the situation in the home. Anna felt that Humberto was unkind to Anna's children; he made them feel like they were not part of his family and he did not treat them as well as he treated other grandchildren.

Anna admitted that, when she was struggling with her addiction, she would do "pretty much" anything for money to support her habit. After she moved out of the Diaz house, she developed a "friendship" with Humberto, who gave her money "here and there" to help out, even though he almost certainly knew she would use the money for

5

drugs. At some point during this time, Anna used a social security settlement to buy a truck, but the truck was impounded, and she needed $2,000 to get it back. She asked Humberto for the money and promised to repay him. Instead, he asked her to agree to have sex with him. Anna did agree, but always made excuses and never did have a sexual relationship with him. Humberto continued to give Anna money, but Anna felt that he grew increasingly angry with her for not keeping their agreement, and she thought that he took his frustration out on Sanchez and the children, who were still living in his home.

By 2010, Anna viewed herself as a mediator between Sanchez and Humberto and she testified that she personally witnessed many of their arguments. For example, they argued about the way Humberto treated Juanita and they also argued about the fact that Humberto would not let Sanchez move into a vacant bedroom.

Anna testified about three telephone conversations she had with her father during the two-day period before he shot Humberto. First, she spoke with Sanchez on September 12, after he had a major argument with Humberto. Anna recalled that Sanchez was extremely angry, that she talked with him about the problems he was having with Humberto, and tried to assure him that everything was fine, and that they would not be put out on the street.

Anna also recalled two telephone conversations with Sanchez on the afternoon of September 14, 2010. During the first call, Sanchez was extremely angry at Humberto. According to Anna, Sanchez does not anger easily and she had never heard him that mad; she could "just sense the anger that was coming through the phone," and she recalled that "It's not like my dad at all." A short time after this first conversation ended, Anna received a second phone call from Sanchez telling her to come and pick up the children because "the incident had took place."

## 2. *Sanchez's Testimony*

Testifying on his own behalf, Sanchez attempted to explain to the jury how tensions between himself and Humberto built up over the five-year period prior to the fatal shooting. According to Sanchez, when he, Anna and the boys moved into the Diaz

6

home in 2005, both Juanita and Humberto welcomed them, and the extended family got along well even though Humberto had a lot of "rules." However, as time went on, several serious conflicts arose and remained unresolved.

First, Sanchez and Humberto had conflicts regarding Anna. According to Sanchez, Juanita kicked Anna out of the house because she broke one of the house rules by having a friend over. Anna became homeless and turned to Humberto for money, which he gave her on a regular basis. Sanchez told Humberto not to give Anna money because she used it to buy drugs, but he knew that Humberto kept giving her money behind his back. Sanchez was not happy about the situation, but Anna told him to stay out of it, and he was afraid that if he challenged her she would take her kids away from him.

Sanchez admitted that Anna told him that the reason Humberto kept giving her money was because he thought Anna was going to have sex with him. Anna told Sanchez she would never do that, but that if Humberto was "stupid" enough to think she would, then she was going to keep taking his money.

Sanchez testified that he and Humberto rarely talked about Anna, but he did recall a big argument in late 2009. Humberto told Sanchez that he thought Anna had stolen something from his truck and Sanchez did not agree or disagree. Humberto said he knew it was true and that he just wanted Sanchez to confirm it so that he could have some friends "break her legs." Sanchez recalled that he got really "pissed off," but he could not show any anger because he was always worried that Humberto would throw him and the children out of the house. Sanchez's trial counsel asked if Sanchez had felt that Humberto was threatening to break Anna's legs in order to "provoke" him. Sanchez responded, "No. I thought it was because he was just upset with her because she wouldn't give up sex. And he had given her a lot, a lot of money by that time." With some additional prompting from his attorney, Sanchez testified that he was angry about Humberto's threat to break Anna's legs, but that he "[b]ottled it up inside and just walked away."

7

During this same time period, late 2009, Sanchez and Humberto also had a disagreement about sleeping arrangements at the Diaz home. Humberto's uncle, Carlos Llamas, had been living in a bedroom in the house for most of 2009. Llamas was terminally ill and Humberto paid Sanchez $400 a month to care for him until he died at the end of that year. Sanchez had been staying in the living room with his two grandchildren and he wanted to move into Llamas's old room, but Humberto would not let him. Around this same time, Sanchez was cleaning out Llamas's things when he discovered a gun hidden in the back of the bedroom closet.

According to Sanchez, Humberto never liked Sanchez's grandchildren. But, by the fall of 2009, his behavior toward them became "a lot, lot worse." For example, Sanchez bought bikes to give the children for Christmas but Humberto threw them in the dumpster. Another time, Sanchez bought a puppy but Humberto would not let them keep it. He would pop their balls, throw away their scooters and skateboards and did just "thousands of little things" that upset Sanchez. Sanchez testified that Humberto became less and less tolerant of the children as time went on and, by 2010, he and Humberto frequently argued about them. According to Sanchez, Humberto knew that picking on the children was something "that would aggravate me very much."

In addition, the two men had conflicts about Juanita, who had suffered a stroke in 2009 and was in declining health. According to Sanchez Juanita could no longer care for herself and he took full responsibility for her care. However, Humberto objected to the way that Sanchez took care of Juanita; Humberto wanted her to be more independent which Sanchez did not think was realistic. Sanchez also felt that Humberto mistreated Juanita.[4] When they argued about Juanita, Humberto often told Sanchez to get out of the

_____

[4] Juanita's daughter, Eva Hauck, spent a lot of time at the Diaz home. She was 17 when her mother married Humberto, and when her own children were young, Juanita took care of them at the house. Hauck testified that Humberto was good to her children, gave them financial support and was also known as a person who helped everyone. Hauck also believed that Humberto had taken good care of Juanita after she became ill.

8

house, but Sanchez would respond that the house belonged to Juanita, that she was the boss and that she wanted him there.

Two days before the shooting, Sanchez and Humberto had yet another fight during which Humberto tried to kick Sanchez out of the house. Sanchez testified that Humberto started the argument by blaming Sanchez for a mess that the construction crew had left in the kitchen. Humberto told Sanchez he was useless and to move out. Sanchez was "livid" because he felt that he did so much work around the house. He moved the argument to Juanita's room because he wanted her to hear what he had to say.

Sanchez used the September 12 argument as an opportunity to show Juanita that Humberto was a liar. He told her that Humberto was cheating on her, that he had tried to "hook up" with Anna, and that he gave Anna money for drugs. Juanita got really upset when she heard that Humberto gave Anna money but he just said that she needed it. Sanchez testified that he was very angry during the argument and admitted that he and Humberto both threatened to kill each other. However, after about 10 or 15 minutes of arguing, Humberto said there was no big deal and that "its not important." At that point, Juanita asked Sanchez to leave the room so she could talk to Humberto in private. After another 15 minutes, Humberto came out of the room and said that Sanchez and the boys did not have to move out.

After the September 12 argument, Humberto started to ignore Sanchez and acted as though he was not even there. Sanchez thought the matter was finally settled, that Juanita had won the argument, and that he was going to stay in the Diaz house and take care of her. However, two days later, Juanita called Sanchez into her room and told him Humberto wanted him and the boys out of the house by the next day and that he was going to change all the locks on the house. Sanchez became really upset, explaining his feelings to the jury in this way: "It's just an accumulation of three-and-a-half years of him just picking on me, always badgering me, getting in my face, saying things, what he did with my daughter, what he did with treating the kids, all that accumulation of things just kind of like built up in me. I just couldn't take it anymore."

9

When Humberto came home a short time later, Sanchez was on the phone with Anna and he told her he had to go because he wanted to try to talk Humberto out of kicking them out. However, when Sanchez said they needed to talk, Humberto just ignored him, raised his hand in a dismissive manner and went outside to talk with Raygoza. Sanchez testified that Humberto's behavior just made him "snap," and that he "lost it right there." He went into the bedroom closet and retrieved the gun. He went to the doorway between the kitchen and the new addition, said "I told you not to fuck with me," and then shot Humberto at least twice. Then he put the gun in the coffee can on top of the refrigerator and went and helped his mother out onto the front porch where they saw Humberto still alive, lying on the concrete.

## C.    *Incriminating Statements and Conversations*

In October 2010, Sanchez wrote to Anna from jail and warned her that when they spoke in person, they would have to be "discreet" about the way they said things because "they might be listening or recording our conversation."

On July 18, 2011, Anna was interviewed by a defense investigator named Walter Stannard. Anna told Stannard that Sanchez was aware of and approved of Anna's "playing" around with Humberto in order to get money from him. She reported that she had told her father that Humberto had propositioned her for sex when the incident occurred and Sanchez understood that she was playing along because she needed money. Anna also told the investigator that she spoke to Sanchez on September 14, before the shooting, and during that conversation Sanchez said " 'I'm going to kill the motherfucker.' "

After Anna's interview, Sanchez wrote several letters to her in which he discussed the statements she had made to the defense investigator. In an August 9, 2011, letter, Sanchez wrote: "When you told me that you said to the interviewer that I called you & told you what I was going to do. That sent a red flag & warning bells off in my head. I know you probably didn't mean to but you just might [have] sent my case in favor of the D.A." The letter continued: "I think you made it look like pre-meditated murder because I never told nobody that I had called you." Sanchez also wrote: "Damn I fucked-up & I

10

didn't try & figure out how to get our stories straight. My fault. My stupid mistake." The following paragraph of this letter states:

"But, who knows, if the D.A. doesn't know we talked he might not ask you any questions concerning that because without your testimony of you saying that you talked to me just before the incident the D.A. doesn't have nothing really substantial against me. Then I have a very good chance of having my murder charges dropped to a voluntary manslaughter."

Sanchez ended his August 2011 letter by telling Anna that "[w]ere going to have to start getting [ourselves] more organized & our stories straight now that my case is going to trial."[5]

In a September 20, 2011, letter, Sanchez told Anna: "My one big question now is I'm wondering if my lawyer will treat me different. You know, my lawyer had this certain opinion of me. Now because of what you said will that change & will he start treating me and this case differently. Because I had him totally convinced that this wasn't pre-meditated, but with what you might of said to the investigator I think he's going to look at me in a whole new way." In this letter, Sanchez also wrote: "Did you tell the investigator anything that might give him the idea I was gonna harm Beto in any way? [¶] [Yes or No?] [¶] Because I'm going to have to play off that. So really think hard & go over in your mind all that the two of you talked about (you & the investigator)." And, later in the letter, Sanchez wrote, "Now that I'm getting closer to a trial, I'm trying to prepare myself. I'm really trying hard to see if I can get my murder charge dropped to a voluntary manslaughter."

---

[5] In this same letter, Sanchez asked Anna a series of yes or no questions, and told her to provide answers using a code. Sanchez wrote: "The thing is I'm going to ask them in a numbered sequence & I want you to answer the questions in the same order. [¶] Example: I'll be writing a No.# then a question [¶] . . . then you write the No.# with your answer = 1. yes or no & so on. Got it? Here it goes. [¶] . . . Did you tell the interviewer that I called you just minutes before I did what I did? [¶] . . . Did you say that I said I was going to shoot Beto? [¶] . . . Did you say to the interviewer I was very angry?"

Before Sanchez's trial commenced, Anna sent him a letter in which she wrote: "I am gonna to be testifying real soon, so I want to have everything fresh in my head. I know you already told me, however, I need to know what you want me to say or not say about the phone calls that day. I know you said for sure that the locks were gonna be changed the day he came home early and that really pissed you off. But, what was the reason you completely snapped. *Very important* your attorney & investigator has asked me more than once."

While Anna was testifying at trial, the prosecutor asked her about the letters she and Sanchez wrote to each other while Sanchez was in jail awaiting trial. Anna maintained that she and Sanchez did not try to get their stories straight. She explained that Sanchez was simply trying to think things through. According to Anna, Sanchez genuinely did not recall having two phone conversations with her on the day of the shooting. Also, he just wanted to clarify what she had said to the investigator. When asked whether part of her motivation for testifying was to help Sanchez accomplish his goal of getting his "murder charge dropped to a voluntary manslaughter," Anna responded "Yes sir. Why wouldn't I?"

## D. *The Jury Verdict and Judgment*

The jury was instructed regarding three types of homicide: first degree murder; second degree murder and voluntary manslaughter, based on a heat of passion theory.

The prosecutor argued that Sanchez committed murder not manslaughter; that Sanchez hated Humberto and was angry at him, but that he did not kill under a heat of passion. The defense theory was that Sanchez was guilty of manslaughter, not murder. Defense counsel conceded that his client was not innocent, but argued that the homicide was a manslaughter because there was a "build up of provocations" that occurred over the year or year and a half before the homicide occurred and that there was also a "sudden quarrel" that happened two days before the shooting, as well as an "immediate provocation" just before the shooting, when Juanita told Sanchez that Humberto was going to kick him out of the house.

12

The jury received a "guilty" and a "not guilty" special verdict form for each of the three homicide offenses.  On March 29, 2012, the jury returned two of the special verdicts, one finding Sanchez not guilty of first degree murder and one finding him guilty of second degree murder.

## III.  DISCUSSION

### A.  *The Second Degree Murder Conviction*

Sanchez contends his conviction for second degree murder must be reversed or reduced to voluntary manslaughter because the trial evidence establishes that he did not act with malice aforethought but instead killed Humberto in the heat of passion.  " 'When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.' [Citation.]  We must ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citations.]' [Citation.]" (*People v. Tran* (1996) 47 Cal.App.4th 759, 771-772.)

#### 1.  *Legal Principles*

Murder is the "unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187 subd. (a).)  A killing with malice aforethought constitutes first degree murder if it is willful, deliberate, and premeditated.  (§ 189)  " 'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder.  [Citations.]' [Citation.]" (*People v. Chun* (2009) 45 Cal.4th 1172, 1181 (*Chun*).)  "Manslaughter, a lesser included offense of murder, is an unlawful killing without malice.  [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664.)  "A person who kills without malice does not commit murder.  Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter.  Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the

13

ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).)

"Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*Beltran, supra*, 56 Cal.4th at p. 942.)

Heat of passion is not an element of voluntary manslaughter that the People must affirmatively prove to obtain a conviction for that offense. (*People v. Rios* (2000) 23 Cal.4th 450, 454 (*Rios*).) Rather, it is a theory of " 'partial exculpation' " that reduces "murder to manslaughter by negating the element of malice. [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).) "Accordingly, where murder liability is at issue, evidence of heat of passion . . . bears on whether an intentional or consciously indifferent criminal homicide was malicious, and thus murder, or nonmalicious, and thus the lesser offense of voluntary manslaughter. In such cases, the People may have to prove the *absence* of provocation . . . in order to *establish* the *malice element of murder*." (*Rios, supra*, 23 Cal.4th at p. 454.)

### 2. *Analysis*

In this case, Sanchez argues (1) there is insufficient evidence to support the malice element of his second degree murder conviction, and (2) the prosecution failed to carry its burden of proving the absence of adequate provocation. We will separately address these two erroneous arguments.

### a. *Malice*

Malice, which is defined in section 188, may be either express or implied. Malice is express "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.) It is implied "when no considerable provocation

14

appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Ibid.*)

The statutory definition of implied malice is vague. "Trial courts do not instruct the jury in the statutory language of an abandoned and malignant heart [because doing] so would provide the jury with little guidance." (*Chun*, *supra,* 45 Cal.4th at p. 1181.) Case law establishes that implied malice has " 'both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." [Citation.] The mental component is the requirement that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." [Citation.]' [Citation.]" (*Ibid.*)

Here, the trial record contains substantial evidence of express malice. From that evidence, the jury could have found that Sanchez manifested a deliberate intention to kill Humberto during the argument that occurred a few days before the shooting and again during his telephone conversation with Anna shortly before the murder occurred. In addition, Sanchez himself made comments after the shooting which indicated that he had both planned and intended to kill Humberto. Finally, the letters that Sanchez sent to Anna before trial were not only evidence of a consciousness of guilt but could also have been construed as admissions of malicious intent.

To the extent evidence of express malice is lacking, there is also overwhelming evidence of implied malice. On this record, there can be no dispute that the physical component of implied malice is satisfied; the natural consequences of firing three gunshots at an unarmed and unsuspecting man who is on his knees looking over building plans with his contractor are dangerous to human life. Furthermore, the threats that Sanchez made prior to the shooting, his behavior during the incident, and his words and actions after he shot Humberto are substantial evidence that Sanchez knew his actions would endanger human life and that he acted in conscious disregard for the life of Humberto Diaz.

15

### b.    *Heat of Passion*

On appeal, Sanchez ignores the strong evidence of malice by focusing solely on the question of provocation.  He contends the prosecution failed to carry its burden of proving that Sanchez was not provoked.  Indeed, Sanchez maintains that the evidence of provocation was so strong that no reasonable jury could properly find that Sanchez acted with the malice aforethought that is required to commit second degree murder.

"A heat of passion theory of manslaughter has both an objective and a subjective component.  [Citations.]"  (*Moye*, *supra*, 47 Cal.4th at p. 549.)  " ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " [Citation.]' "  (*Ibid*.)  " 'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.  [Citations.]  The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.  [Citations.]' "  (*Id.* at pp. 549-550.)  "The focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly."  (*People v. Najera* (2006) 138 Cal.App.4th 212, 223.)

Heat of passion manslaughter also has a subjective component; the "defendant must actually, subjectively, kill under the heat of passion.  [Citation.]"  (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.)  To satisfy this subjective element, "the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation.  [Citation.]"  (*Moye, supra*, 47 Cal.4th at p. 550.)

"[P]rovocation sufficient to reduce murder to manslaughter need not occur instantaneously, but may occur over a period of time."  (*People v. Wharton* (1991) 53 Cal.3d 522, 569 (*Wharton*).)  "The key element is not the duration of the source of provocation but ' "whether or not defendant's reason was, at the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection,

16

and from this passion rather than from judgment." ' " (*Id.* at pp. 569-570.)
" ' "However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter . . . ." [Citation.]' [Citation.]" (*Moye, supra*, 47 Cal.4th at p. 550.)

In this case, Sanchez contends that the trial evidence established that Humberto engaged in two types of conduct which constitute legally sufficient provocation:  (1) he threatened to kick Sanchez and his grandchildren out of the Diaz home; and (2) he offered Anna money for sex.  Sanchez further contends that the prosecution failed to produce any evidence from which a jury could have concluded that Sanchez was not provoked by these actions.  We disagree.

The jury's implicit finding that Humberto's most recent threat to change the locks was not legally sufficient provocation was supported by substantial evidence that this threat was another round in an ongoing two-sided family feud between Sanchez and Humberto.  The evidence regarding this dysfunctional relationship substantially supports the conclusion that Humberto's remark to his wife was another empty threat which, although frustrating and annoying, was not sufficiently provocative to lead a reasonable person in Sanchez's position to act rashly or without deliberation.  Testimony by several family members, including Sanchez himself, shows that Humberto's desire to force Sanchez out of the house was well known and long standing and that this was not the first time that Humberto had made this threat.  From this and other evidence in this record, the jury could reasonably have concluded that Humberto's threat to kick Sanchez out of the house was not legally sufficient provocation to vitiate other substantial evidence that Sanchez committed this crime with malice aforethought.

Similarly, there is substantial evidence that Humberto's proposition to give Anna money in exchange for sex would not have provoked a reasonable person to act rashly or without deliberation.  That evidence showed, among other things, that Sanchez had been aware of Humberto's overture for some time and, if he did not expressly approve, he implicitly condoned Anna's tactical decision to encourage Humberto in order to gain financial support.  In either event, the undisputed evidence established that Sanchez knew

17

that Humberto continued to give Anna money even though she did not have sex with him and never intended to.

Alternatively, even if the jury had found that Humberto's conduct was objectively provocative, it could reasonably have concluded that Sanchez was not subjectively acting under a heat of passion when he killed Humberto on September 14, 2010. Indeed, the substantial evidence of both express and implied malice is inconsistent with a finding that Sanchez was actually overcome by the heat of passion when the fatal event occurred. Not only were all of Sanchez's problems with Humberto's behavior long-standing, but Sanchez had threatened to kill Humberto in the past, and he had warned both his mother and Anna of his intention to kill Humberto. This evidence was inconsistent with the defense theory that Humberto's final threat to change the locks made Sanchez "snap" and act rashly without thought or reason.

Nor was the jury required to credit Sanchez's self-serving testimony that his passion was inflamed when Humberto refused to talk with him and treated him disrespectfully just minutes before the fatal shooting. Indeed, that testimony was contradicted by Raygoza's testimony that Humberto did not even go into the house when he came home from work on the day Sanchez killed him. Even if that interaction did occur prior to the shooting, the evidence about what Sanchez did next was consistent with the conclusion that he was not subjectively acting under a heat of passion. Sanchez went and retrieved a gun which he had left hidden in a bedroom closet for several months. He had or found bullets to load the gun. He then went and found Humberto, who was neither armed nor looking for a fight. Then, he shot Humberto more than once with a gun that was not easy to fire. And, finally, he fired a third shot as Humberto tried to run away. From this evidence, and the other evidence of malice aforethought summarized above, the jury could have concluded that, when Sanchez killed Humberto, he acted with intention, out of hatred, anger and perhaps even frustration, but not because he was provoked to act rashly or without reason.

On appeal, Sanchez suggests that Humberto's attempt to have sex with Anna was legally sufficient provocation because that conduct was the impetus for the argument a

18

few days before the shooting. The record shows that Humberto's sexual misbehavior did come up during that argument. However, the revelation about that allegedly provocative conduct was not made to Sanchez; it was made by him, in an apparent effort to impassion Juanita and gain her support in Sanchez's ongoing feud with Humberto.

Sanchez also zeros in on the conversation he had with Juanita on the day he shot Humberto. He characterizes Juanita's revelation that Humberto was going to change the locks as the final provocative act that essentially caused him to snap and to act rashly and without reason. To support this theory, Sanchez emphasizes that no more than two hours passed between the time of his conversation with Juanita and the time he killed Humberto. Sanchez also maintains that evidence of his allegedly irrational behavior during and after the shooting compels the conclusion that he acted without reason or judgment. For example, he shot Humberto in front of a witness, he stood over Humberto's body and yelled "fuck you," and he was still extremely angry and agitated when the police arrived.

As explained above, provocation can occur over a period time. (*Wharton, supra,* 53 Cal.3d at p. 569.) However, this rule does not affect the weight of the evidence establishing that the conduct which Sanchez would characterize as provocative was actually part of a two-sided, ongoing family feud. For the reasons we have already explained, the jury was not required to accept Sanchez's claim that Humberto's past conduct was provocation or that it caused Sanchez to snap during his conversation with Juanita. Furthermore, we reject Sanchez's assumption that his behavior during and immediately following the shooting could only be interpreted one way, as proof that he acted without thought or reason. Indeed, the jury's perceptions of that conduct could well have been colored by the credibility determinations it made about Sanchez and Anna.

At best, Sanchez's characterization of the events that unfolded on the day he shot Humberto is an alternative interpretation of the trial evidence. But the question on appeal is not whether the jury could have found that Sanchez killed in the heat of passion. Rather, Sanchez's claim of error is that the jury's actual finding that Sanchez killed with

malice aforethought is not supported by substantial evidence. For all of the reasons discussed above, we reject that claim.

**B.** ***The Pinpoint Heat of Passion Instruction***

Sanchez contends the trial court erred by denying his request for a special instruction which pinpointed his defense theory that he committed this crime under a heat of passion.

### 1. *Background*

The jury received separate instructions regarding the crimes of murder with malice aforethought, first degree murder, and voluntary manslaughter. With regard to the murder crimes, the jury received an instruction regarding the elements necessary to prove either first or second degree murder and a separate instruction regarding the additional elements necessary to prove first degree murder, i.e., that the murder was willful, deliberate and premeditated.

The trial court then used CALCRIM No. 570 to instruct the jury regarding the crime of voluntary manslaughter as a lesser included offense of the charged murder. Pursuant to that pattern instruction, which is based on the heat of passion theory of manslaughter, the jury was instructed as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

20

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up [his] own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

The jury also received the following special instruction regarding the role of provocation in determining whether Sanchez committed first degree murder, second degree murder, or manslaughter: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed a murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also consider the provocation in deciding whether the defendant committed murder or manslaughter."

However, the trial court denied a defense request to instruct the jury with the following special instruction: "In considering whether the provocation caused the defendant, Luiz Rick Sanchez, to act in the heat of passion, it is not necessary for you to

21

decide if the provocation would have caused the average person to have been provoked to kill, just to act rashly and without deliberation."

## 2. *Analysis*

Sanchez contends he was entitled to this special instruction because it was an accurate statement of the law which pinpointed his defense theory that "a reasonable person in Sanchez's position would have been provoked to act rashly, though not necessarily to kill, and that therefore the killing was voluntary manslaughter, not murder."

As a general rule, the " ' "defendant has a right to an instruction that pinpoints the theory of the defense . . . ." ' [Citation.] The court may, however, 'properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation].' [Citation.]" (*People v. Burney* (2009) 47 Cal.4th 203, 246; see also *People v. Moon* (2005) 37 Cal.4th 1, 30.)

In the present case, the trial court refused to give Sanchez's special instruction because it was potentially confusing and because CALCRIM No. 570 accurately and adequately instructed the jury regarding the standard of provocation sufficient to reduce a murder to manslaughter. On appeal, Sanchez does not challenge the accuracy of any language in CALCRIM No. 570. Instead, he argues this instruction is incomplete and/or misleading because it does not expressly instruct that the jury is not required to find that a reasonable person in the defendant's position would have been provoked to kill. We strongly disagree with this contention which is not supported by any relevant authority. Indeed, this claim is inconsistent with our Supreme Court's recent holding in *Beltran, supra,* 56 Cal.4th 935, a case upon which Sanchez mistakenly relies in his reply brief.

In *Beltran, supra,* 56 Cal.4th 935, the defendant was convicted of second degree murder for the stabbing death of his former girlfriend, the jury having rejected his defense that he killed in the heat of passion. On appeal, he argued that the trial court erroneously instructed the jury regarding the standard of provocation necessary to reduce murder to manslaughter by using a 2006 version of CALCRIM No. 570 which stated, in

part: " 'In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts.' " (*Id*. at p. 954.) The defendant argued this instruction was misleading because it encouraged the jury to question whether "an average person would react *physically* and kill," when the only relevant question was whether an average person would react "*mentally*, experiencing obscured reason precluding the formation of malice." (*Id*. at p. 945.)

The Court of Appeal agreed with the *Beltran* defendant and reversed the judgment. (*Beltran, supra*, 56 Cal.4th at p. 945.) It found that the language in CALCRIM No. 570 quoted above was ambiguous because it " 'did not expressly limit the juror's focus to whether the provocation would have caused an average person to act out of passion rather than judgment' " and because it allowed or maybe even encouraged "jurors to consider whether the provocation would cause an average person to do what the defendant did; i.e., commit a homicide." (*Id*. at p. 954.)

The People sought review of the appellate court's decision in *Beltran, supra*, 56 Cal.4th at page 946, arguing there was no reversible instructional error. The People also took the position that the 2006 version of CALCRIM No. 570 did not actually go far enough, and that "the proper standard for assessing the adequacy of provocation is whether an ordinary person of average disposition would be moved to kill." (*Id*. at p. 946.)

The *Beltran* court granted review in order to "clarify what kind of provocation will suffice to constitute heat of passion and reduce a murder to manslaughter." (*Beltran, supra,* 56 Cal.4th at p. 938.) To answer that question, the court reaffirmed an almost 100-year-old test for assessing provocation in this context: "[W]hen examining heat of passion in the context of manslaughter, the fundamental 'inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than

23

from judgment.' [Citation.]" (*Id.* at pp. 938-939, *quoting People v. Logan* (1917) 175 Cal. 45, 49.)

The *Beltran* court then rejected the People's theory that provocation requires a finding "not only that an ordinary person of average disposition would be liable to act rashly and without reflection, but that such a person would act rashly in a particular manner, namely, by killing." (*Beltran, supra*, 56 Cal.4th at p. 942.) The court reasoned that a test that asks whether the person of average disposition would be moved to kill focuses on the wrong thing: "The proper focus is placed on the defendant's state of mind, not on the particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would act in a certain way: to kill. Instead, the question is whether the average person would react in a certain way: with his reason and judgment obscured." (*Id.* at p. 949.)

However, the *Beltran* court also disagreed with the Court of Appeal's analysis of the 2006 version of CALCRIM No. 570; it found that the challenged language in that instruction was neither ambiguous nor inadequate. (*Beltran, supra*, 56 Cal.4th at p. 954.) The court reasoned that "[t]elling the jury to consider how a person of average disposition 'would react' properly draws the jury's attention to the objective nature of the standard and the effect the provocation would have on such a person's state of mind." (*Id.* at p. 954.)

On appeal, Sanchez contends that *Beltran* supports his claim of instructional error because that case "reaffirm[s]" the legal principle reflected in the pinpoint instruction that the trial court refused to give, i.e., that it is not necessary for a jury to conclude that a reasonable person would have been provoked to kill. But this contention completely misses the relevant point. *Beltran* did not hold or in any way intimate that this legal principle is part of the standard for assessing provocation in this context. Indeed,

24

Sanchez provides neither authority nor any sound reason for his contention that he was entitled to a pinpoint instruction on a principle of law that is not part of the legal test for assessing provocation.

Furthermore, Sanchez conveniently overlooks the fact that *Beltran, supra*, 56 Cal.4th 935, undermines his claim that the current version of CALCRIM No. 570 is either misleading or insufficient to instruct the jury regarding the proper standard of assessing provocation when there is a question whether the defendant killed in the heat of passion. The *Beltran* court approved the 2006 version of CALCRIM No. 570 because it found that the challenged language did not mislead the jury or improperly focus the jury's attention on the defendant's act rather than his state of mind. (*Id.* at p. 954.)

Any lingering concern about potentially ambiguous language in the 2006 version of CALCRIM No. 570 was resolved in 2008 when the instruction was revised in order to clarify the standard of provocation by eliminating the language that had troubled the appellate court panel that decided *Beltran* and replacing it with the following language: " 'In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.' " (*Beltran, supra*, 56 Cal.4th at p. 954, fn. 14.) We reject Sanchez's unsupported notion that this language is misleading or incomplete.

Finally, in our opinion, *Beltran* highlights a material flaw in Sanchez's special instruction. *Beltran* teaches that the "proper focus" of the provocation inquiry "is placed on the defendant's state of mind, not on the particular act." (*Beltran, supra*, 56 Cal.4th at p. 949.) But Sanchez's proposed instruction focused on the conduct of the defendant rather than his state of mind; by telling the jury that it did not have to find that an average person in Sanchez's position would "have been provoked to kill," this special instruction strayed from the proper the inquiry by diverting the jury's attention to the act that Sanchez committed rather than his state of mind. In other words, the special instruction that Sanchez advocates here is the opposite side of the same flawed theory that the People advanced in *Beltran*. It would have instructed the jury to focus on the conduct that the

25

provocation might cause in an ordinary person by telling them that said conduct does not have to be a killing. That is not the proper standard for assessing provocation in this context. (*Beltran, supra*, 56 Cal.4th at p. 949.)

For all these reasons, we conclude that the trial court did not err by refusing to give the pinpoint instruction that Sanchez proposed.

## C.     *The Prosecutor's Conduct*

Sanchez contends that his federal due process rights were violated during closing arguments to the jury because the prosecutor committed prejudicial misconduct by (1) misstating the legal test for determining whether a defendant killed in the heat of passion, and (2) shifting the burden of proving voluntary manslaughter onto the defense.

### 1.     *Legal Principles*

" '[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 829-830.)

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44; see also *People v. Farnam* (2002) 28 Cal.4th 107, 167; *People v. Wilson* (2005) 36 Cal.4th 309, 337.)

" 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' [Citation.] 'Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide. [Citation.]' [Citation.] In order to preserve an appellate claim of prosecutorial misconduct, a defendant must make a timely objection at trial and request an admonition;

26

otherwise, a claim is reviewable only if an admonition would not have cured the harm caused by the misconduct. [Citation.]" (*Wilson, supra*, 36 Cal.4th at p. 337.)

**2.** *Analysis*

In the present case, Sanchez's trial counsel did not object to the prosecutor's allegedly improper comments. Absent evidence or even a contention that an admonition would not have cured the perceived harm, Sanchez forfeits his claim of prosecutor misconduct. (*Wilson*, *supra*, 36 Cal.4th at p. 337.) Furthermore, even if this claim of error was properly before us, we would reject it.[6]

Sanchez first contends that the prosecutor misstated the legal test for determining whether a defendant acted in the heat of passion by telling the jury that the question whether Sanchez committed murder or manslaughter depended on whether he acted reasonably by killing Humberto. To support this claim, Sanchez strings together isolated statements from different parts of the prosecutor's lengthy summation. After considering the challenged remarks in the context of the arguments the prosecutor made, we conclude that it is not reasonably likely that the jury construed the prosecutor's comments in an improper or inappropriate manner. (*Wilson, supra*, 36 Cal.4th at p. 337.)

To be sure, the prosecutor characterized Sanchez's decisions and conduct as unreasonable. However, he did not argue or intimate that the test for determining whether a person kills in the heat of passion requires the jury to find that Sanchez acted reasonably by killing Humberto. To the contrary, while arguing that there was a dearth of evidence that Sanchez committed a voluntary manslaughter, the prosecutor correctly recounted the three requirements for finding a heat of passion killing: that the defendant was provoked; that the defendant acted under that provocation; and that "this provocation has to be such that it would have caused the person of average disposition to act rashly without deliberation; that is, from passion rather than judgment."

---

[6] Thus, we need not consider Sanchez's related theory that his trial counsel's failure to lodge objections to the prosecutor's comments constituted ineffective assistance of counsel.

Any lingering danger that the jury might have misinterpreted or been misled by the prosecutor's comments was eliminated by the jury instructions the court gave in this case. We presume that the jury followed those instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) We also presume that the " 'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Seaton* (2001) 26 Cal.4th 598, 646; see also *People v. Samayoa* (1997) 15 Cal.4th 795, 844.)

Here, as discussed above, the jury was instructed with CALCRIM No. 570, which reinforced the prosecutor's correct recitation of the test for determining whether a killing which might otherwise be murder was manslaughter because the defendant acted under the heat of passion. Furthermore, the jury was also instructed with CALCRIM No. 222, which told them that "[n]othing that the attorneys say is evidence." This instruction further reduced the likelihood that the jury would misconstrue the prosecutor's statements about the unreasonable nature of Sanchez's conduct.

Sanchez's second argument is that the prosecutor shifted the burden of proving voluntary manslaughter onto Sanchez by telling the jury that the law sets up "a lot of barriers" and "demands" before a jury can find that a defendant committed this offense.

The theme of the prosecutor's closing argument was that Sanchez killed Humberto out of hatred and anger but that he did not kill under a heat of passion. In pursuing that theory, the prosecutor argued that the evidence did not establish the elements of heat of passion voluntary manslaughter. However, the prosecutor never argued that the defendant had the burden of proof with respect to this or any other matter. The jury was repeatedly instructed about the prosecutor's burden of proof in this case, including its burden of proving beyond a reasonable doubt that the defendant "did not kill as the result of a sudden quarrel or in the heat of passion." As noted above, we presume on appeal that the jury followed these instructions. (*People v. Boyette, supra,* 29 Cal.4th at p. 436.) Thus, we are not persuaded there was a reasonable likelihood that the jury interpreted the prosecutor's comments as imposing any burden of proof on the defendant in this case.

28

For all of these reasons, we reject Sanchez's contention that the prosecutor committed prejudicial misconduct during closing argument.

**D.    *Sentencing Error***

Sanchez's final claim of error is that he was denied credit toward his sentence for the 597 days he was in custody prior to sentencing.

The trial court denied Sanchez's request for custody credit pursuant to section 2933.2, which states, in subdivision (a):  "Notwithstanding Section 2933.1 or any other law, any person who is convicted of murder, as defined in Section 187, shall not accrue any credit, as specified in Section 2933 or Section 2933.05."

Although section 2933.2 does preclude Sanchez from obtaining conduct-based presentence custody credits, he is nevertheless entitled to actual custody credit for "all days of custody," including partial days.  (§ 2900.5, subd. (a); *People v. Herrera* (2001) 88 Cal.App.4th 1353, 1365-1366.)  In light of this authority, the People concede that Sanchez is entitled to presentence credit for actual days spent in custody and that the number of credits Sanchez accrued amounted to 597 days.  Therefore, we will order that the abstract of judgment be corrected to reflect this credit.

## IV.  DISPOSITION

The judgment is affirmed.  This case is remanded to the trial court with directions to (1) prepare a corrected abstract of judgment awarding Sanchez his presentence custody credits (§ 2900.5), and (2) forward a certified copy of the amended abstract of judgment to the Department of Corrections.

                                   _____

                                   Haerle, Acting P.J.

We concur:


_____

Richman, J.


_____

Brick, J.*

      * Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.